The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having a manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Well, we've lost our audience, but we're still here. We're having here argument in No. 151521, Graham v. Gagnon. Mr. Glasberg, we're happy to hear from you. Good morning. May it please the Court, I'm Vic Glasberg. I represent the appellant, Lauren Graham. I hope to be able to make three points in my argument now. First, to focus on the inappropriate consideration of the Virginia law of obstruction of justice that occurred below. Second, to focus on the inappropriate focus on the reliance on what the magistrate did, rather than on what the officers did. And thirdly, and very briefly, to focus on the inappropriate shifting of inferences favoring the moving party, in this case, the officers. With regard to the obstruction of justice, the defense says in its brief, page 15, that the elements of obstruction of justice are irrelevant. Now, of course, we are here not in a criminal case, on a qualified immunity case, and the elements of obstruction of justice are not dispositive. But they are surely not irrelevant, because the reasonableness of the actions of the officers in determining whether there was reason to believe that there had been an obstruction of justice must be measured against the law of obstruction of justice. I'd like to read the only quotation I'm going to read of any consequence from the Court's decision, this Court's decision in Rogers v. Pendleton in 2001. A conviction for violation of the statute requires proof of acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to obstruct ordinarily implies opposition or resistance by direct action. It means to obstruct the officer himself, not merely to oppose or impede the process with which the officer is armed. Thus, like the statute considered by the Virginia Supreme Court in Jones, another case, it requires actual hindrance or obstruction of the officer, opposition or resistance by direct action. That is the standard by which what Lauren Graham did must be judged. And, in fact, the standard that was used by the officers was altogether different. Officer Clipp testified that in her view, this is on page 250 of the appendix, Ms. Graham's failure to bring Colby to the door was obstruction. Officer Freed, the ranking officer of the three on site, testified, appendix page 372, that it was obstruction for Ms. Graham not to bring Colby to the door. Please note, she brought Colby to the door in less than five minutes, but that's not my point. My point is that under our constitutional scheme, upon hearing the police knock at the door, Ms. Graham could have invited Colby into her room, turned on the TV, and sat quietly. She would have ended up with a busted down door and no claim against the police for using a battering ram, but she does not have to do the police work. They thought she did. I don't believe that that argument will be mounted by the defense before you today because it's so palpably wrong, but it is what they thought at the time. You didn't make any claim in your complaint against the police department? No, ma'am. And was there any questioning in deposition about training? Yes, ma'am. And the testimony, which was provided not only by Officer Gagnon but by the chief of police, was that one has to respect the home. You don't go in, particularly on a misdemeanor. No, but was there any training about what this offense consists of? I'm sorry, the defense? You had been talking to me about, or talking to us, about what the state law was with respect to the offense that she assertedly committed. Yes. Was there any training to the officers about that? I'm just curious. In other words, did they make any claim that this is what we were supposed to be doing? No, ma'am. Our ideas about what is the offense here is what we were taught. If I recall correctly, and I don't know that it's in the appendix, the police chief readily acknowledged that Lauren Graham was under no obligation to bring Colby to the door to be deputized to do the work for the police. Right. That was never offered as a justification or as a reason for whatever they did. That never came up. Can you give me the timing of the foot in the door? Was it initially done before she went upstairs to find her son, or was it after? Okay. She didn't have to go upstairs to find her son, sir. He was downstairs. The door knocked. It was after midnight. She's awakened from sleep, puts on some robe over her nightclothes, comes downstairs, greets Officer Clipp, who's been pounding at the door. Officer Clipp says, we have a warrant for your son. You need to get your son. She says, warrant? Can I see the warrant? We don't have the warrant. You don't need to see the warrant, whatever. She says, and it's in the appendix, I'll go get. Let me speak to Colby. This is actually out of Officer Clipp's testimony. It was at that time that, in fact, it's at the appendix at page 238 and 239, you can read where at this point in the colloquy, pretty early on, Officer Clipp asks her to get Colby, and she says, I'll get Colby. Let me find it. She's describing how she puts her foot in the door. And you'll do that by doing what you described, by striding forward to a certain degree so that the door cannot be closed without your consent? Yes. And that's what you did in this case? Correct. Okay. And while in that position, you asked Lauren to have Colby step out of the house in order to be taken into custody? Yes. So it was right then, pretty much at the beginning, Ms. Graham lets go of the door and goes to get Colby. Can I just ask you? Yes, ma'am. Going back to my question, maybe I can be a little clearer. Yes, ma'am. It seems to me that I read their brief as saying that, or read their deposition testimony as saying we thought that she was obstructing justice. Right? This is why we got the warrant. And what I wanted to know was when in deposition, if you probed them about why they had the understanding that what happened here was obstruction of justice. Yes, Judge, because they took the position that her failure to bring Colby to the door was obstruction of justice. You'll see on page 250 of the appendix, Judge. Well, at 249, I understand. Yeah, I see it. My question is, was it your understanding that it was her obligation to bring Colby to the front door having been asked by you? Yes. Okay. And that her failure to do so is obstruction of justice. Right. Yes. That's clip. And then 3-372. I can find them. I don't want to take up your time. Yes, ma'am. So what I really wanted to know was that you also deposed the police chief. Did he also say that he thought that that was obstruction of justice? She. No. She. Sorry. No, absolutely not, Judge. Categorically not. And had I thought the issue would be raised, I would have put it in the appendix. Sorry. In addition to what they said was obstruction, let me offer you some thoughts about why they did not act as though she had been obstructing. First of all, Officer Gagnon specifically said at page 163 and 164 of the appendix in his deposition, I asked him, are there times when people will be obstructing and what do you do? I asked him, let's say you're trying to arrest someone and somebody bothers you and gets in your way. Let me get it straight. So if you're arresting somebody and a third party physically interferes with your ability to do your arrest, you will tell that third party to stand back and not interfere and not obstruct because that third party will be facing his own charges. Is that correct? That's correct. Why didn't you apply that rule to Lauren Graham? Because it was not an actual, we didn't have hands on and she wasn't trying to interfere when we had hands on. Okay. In other words, her obstruction was considerably less than actually physically interfering with you. Yes. Thank you. So far as Officer Clip is concerned, the only obstruction was the matter of the foot in the door. There's no other obstruction alleged by Officer Clip. And she confirms that at 248. Did any of the three of them obstruct you in what you were trying to do physically in any way? Aside from Ms. Graham starting to shut the door, no. That's Officer Clip. In addition, Officer Clip never took any steps to arrest Lauren Graham. She testified that when there is someone who commits a crime in her presence, she'll arrest that person. Now we're told they were shorthanded and they couldn't do it at the time. She didn't do it when she got back to the station either. She never took any steps. On the question of obstruction and Officer Clip and the foot, Officer Clip was perfectly clear. She wrote it in her own police report on page 28 of the appendix. She never intended to enter the house. Even when the two other officers, Gagnon and Freed, after Lauren Graham brought Colby towards the front and they saw him, he came into their line of sight, and you can see the little sketches on page 20 of the appendix, they came in, she stayed outside. She said she was not planning to go in. She said that to Lauren Graham, and she wrote it in her report at page 28, which is another question of how you could obstruct somebody from doing something that they weren't going to do, but she was never going to go in in the first place. You have asked us not only to reverse the grant of summary judgment to the officers, but to grant judgment to you. Yes, ma'am. But your argument has proceeded on the basis of we accept the facts as stated by your client. If we accepted all of the facts as stated by the officers, how could we, which we have to do if we're going to grant summary judgment to you, right? How could we do that? Reasonable inferences from undisputed facts. I grant you that. But there are, they said, some of the officers said 20, this whole period took 20 minutes. Judge, what I'm thinking of is a line of cases from the Supreme Court having to do with videotapes. If I've got a videotape that shows A, you have the right not to hear counsel say not A. We have their police log. This isn't as though Lauren Graham had her stopwatch on and she says, well, it really only took 15 minutes or 20 minutes or five minutes or three minutes. This disc, which I think it's in the appendix, but in addition to the disc, there's a printout which has the times. It has the times. It wasn't 20 minutes. And by the way, the 20 minutes wasn't volunteered by them. It was volunteered by Colby. Colby said it was short. I don't know how long it was. There's evidence in the record, though, is all I was really getting at. Fair enough, Judge. Colby would be a better witness for them than one of them. But not a better witness than what I respectfully submit is the dispositive and conclusive evidence of the police-timed radio dialogues, which show that from the time of the knock until Colby was already in custody is less than seven minutes. That is not disputable. And I respectfully submit that since it's the police's own records, they can't avoid it, and that this court, the district court, could have and this court can impose that time as the time in which this occurred. The business about the foot, this is a specific intent crime. One has to intend to obstruct. Lauren Graham is standing at the door with a storm door on an air pump. She is asked to go get Colby, and she does. She lets go of the door, which closes. That can't figure as an intentional slamming of the door in anyone's face. My red light is on. I have a number of additional points from my initial statement, but I will address them on rebuttal. Thank you, Judge. Thank you. Ms. Judkin? Yes, Julia Judkins for the Appalese-Ganyon and Ms. Klipp. One of the things I want to respond to with regard to what Mr. Glassberg said, his interpretation of the audio tape. And the case he's talking about is Scott v. Harris. It is wrong. If you listen to the tape and you look at the tape and you compare it to the event report, you will see that in the middle of Exhibit 9A, which is the actual printout of what's on the audio tape, the interaction that starts this process after Ganyon goes to get the warrants in Arlington is at midnight, 12-15-07 seconds. It concludes with the dispatch from Officer Klipp telling them he's in custody, and that's at 12-32. All right, so you've got Colby Twynham guesstimated 20 minutes. Mrs. Graham says it's only five minutes. It's five to seven minutes. It's actually seven minutes from the time Ganyon gets to the house, to the door. But a lot happened before that that Ganyon was aware of because he's listening to the radio dispatch. My argument is premised on Judge Ellis' opinion, citing Messerschmitt and Torchinsky. You start with, number one, they have a warrant. So this is a case where, objectively, there's reasonable evidence that the officers acted reasonably because they have a warrant. I thought you start with whether they should have gotten a warrant in the first place. Well, then you back from they have the warrant. The warrant isn't a presumption. What it is is if there's three exceptions. You start with, here, they have the warrant. All right. So what do we look at? But isn't this case about whether they should have gotten a warrant? Well, that's one of the arguments, whether they should have, whether an objectively reasonable police officer would have sought the warrant. But the fact that they sought the warrant is one factor in examining the objective reason. I don't understand what you mean by it's one factor. Clearly, the warrant pretty much immunizes them from anything and everything. I don't think there's much dispute about that, although I'm sure plaintiffs would dispute it. But this case is about whether a reasonable police officer would have sought a second time a warrant. Right? That's what this case is about. Yes, but that's subsumed in the entire analysis of the fact that they got the warrant. Under Messerschmidt, they said there's an exception. This is not absolute. If a reasonable police officer wouldn't have sought the warrant, then that takes them outside of the protection of the fact that he had the warrant. But it's still a high burden. I'm talking about procedural. Well, I think that you're saying the same thing. We are. But you have to start with what do we know already? There's no reason for the warrant. Pardon? The warrant doesn't help you. There's no reason for the warrant. Well, it's more than if there's no reason. It's more than if, objectively, reasonable police officers would not have sought the warrant. Do reasonable police officers know the law? Well, yes, they do, and the statute says. They must know the law, right? That's a requirement. They must know the law in absolute. Yes, they're trained. They're certified. The state requires certain training and certified. It doesn't just because, but the cases are very clear that you look at the totality of the circumstances that the officer knew at the time. This is more than they expected her to bring him to the door, and she didn't do it. Over at least a 15-minute period of time, she had an interaction with another officer at the side door. Mr. Lilich confirms that she spoke to the officer at the side door, as did he, and they didn't open the door and they would not respond to him. She also does not dispute the fact that the door, although she denies she did it, that the door could have been shut on Officer Clipp's foot. One thing the court said in Messerschmitt, the Supreme Court, is you start with the idea, okay, a warrant was obtained, and that's one factor that someone thought that what Officer Gagnon told the magistrate was sufficient. That's one factor. Then the district judge approved it. But more importantly, as in these cases, supervisors were involved. Supervisors. The Supreme Court took into account, as did the Fourth Circuit, that supervisors said, Officer Gagnon didn't on his own decide to go back and get the second warrant. His supervisor said, you go back. You go back and tell him this additional information. One of the things that troubles me here is what exactly was said to the magistrate about the foot, and the fact that your client's deposition testimony is sort of floated away from one thing to another. They offer a far less aggressive trapping of the foot in some of the deposition testimonies than they do in others. Wouldn't you agree? No. You don't think the testimony changed? You see, it doesn't help. I mean, I'm not going to bore you with going through each thing in the deposition, but you were there, and you know what they said. Yes. And they weren't prepared to say that she slammed the door on the foot. No, and they didn't say that. Well, it's unclear because in the first iteration of this, the officer says, well, she slammed the door on my foot. At least that's what's reported. No. And then they slipped. Okay. I'm sorry, pardon me. I didn't mean to interrupt you. I believe the record, and if you don't want to own up to the record, it's okay. No, no, I do. I'm trying to figure out who it is. There was a side door that was slammed. No, no, no. And plaintiff has argued that one of our experts said that someone slammed the door, but that was not an admissible form before the trial court. But if you look at Ms. Clipp's report, she never said they slammed the door on her foot. And Gagnon was questioned in deposition, and it's in the appendix. I never was told the door was slammed on her foot. If she didn't slam the door, then what is the obstruction of justice? The obstruction is not just the door. The obstruction from their perspective. It's not the door at all because she didn't slam the door. She didn't slam the door. It's that 15 minutes where she says it's 5 to 7, right? No, we're talking about the plaintiff's deposition to testimony, 5 to 7, right? Yes. But remember, she was not aware of the encounter between Colby at the side door and him running from the police officers. That's part of the continuum. My client was aware of that, that she came through the side door and wouldn't talk. If she wasn't aware of it, how can it be obstruction? The 5 to 7 minutes has to be the stuff that she was aware of, right? My client is told, if you listen to the recording, my client is told en route. First, she won't open the door. Second, Colby runs in and slams the door. She wants to see the warrants. He says to her, Freed, she doesn't have to see the warrants. This is all on the tape. And then she says, but I want her to open the door. So when are you going to get here? When are you going to get here? She doesn't know he's already run, but Gannon knows that. Clip knows that. They think that she is preventing them from coming in and trying to delay them. That's what they think. And they reasonably can think that. It's not her fault she doesn't know that Colby ran in. She didn't know that. The 5 minutes is from when she opens the door. So there's more time. There's more information that comes to Gannon and that Freed knows, the supervisor, and that Clip knows. The allegations, if you recall from the complaint, are that my clients lied, made things up, and that they were contrary to their report. That's not true. Clip has in her report. She attempted to shut the door on me. I told her you have to leave the door open for officer safety. Now, in their view, that's everything. Yes, there's no affidavit to the magistrate, but they have no evidence to rebut that Gannon said in his deposition, this is what I told the magistrate. Everything in my report, which is that they wouldn't answer the side door. To go back to what my friend Judge Davis said, it's what they told the magistrate. Would a reasonable police officer think that's a basis for a warrant? Yes, and Judge Ellis found based on the facts. Really, we actually have read the district court. Oh, I know, I know. Don't think anything else of us. Well, I argue then that in the cases that we've cited, the evidence that the supervisor agreed with it, Lieutenant Zicula agreed in deposition that the officers complied with the policies, procedures, and training. The chief agreed with that. Why cannot that be considered as evidence of what an objectively reasonable police officer would do in light of Messerschmitt, where that was part of the reasoning behind it? It seems to me if a jury believes that, then that's perfectly the way the system is supposed to work. But then the purpose of qualified immunity is lost for these officers who did go to a magistrate. They didn't just arrest her. Not if we credit everything that is on the other side. You want to credit all of your clients' testimony. No, I was taking all of it. Mr. Lilich's? No, no, no, but we don't take all of it. We credit her version. And her version, Mr. Lilich's, she did encounter police at the side door and did not respond to them and did not open the door for them and walked away. But the question is whether that is enough to constitute obstruction of justice so that a reasonable police officer would think that there was probable cause that obstruction of justice had taken place. Well, given Virginia case law on it. Right. That words alone can constitute obstruction. And there's a continuum. What if she had never answered the door at all and eventually they break in the house or he comes to the door and they discover that mom is in the house for 20, 25 minutes, awake, aware that they're outside. Would that constitute obstruction of justice in your view? Well, no, sir, it wouldn't. But this is more than that. It would not. No, that she was just sitting in the house and not opening the door. Yeah. But here the officers. So what more did she do other than open the door and eventually bring her son to the door? Well, she didn't. But that's what, if you look at the actual facts that came in, she didn't tell the officers what she was trying to do. She said I need to talk to my son. Is that probative of an obstruction of justice? Well, at 12, 15, 12, 30 at night. Could you just answer my question? Is that probative? It is. They think she's not. So if she looked out the window, I'm changing my hypothetical a little bit, if she looked out the second floor window, said nothing, and just went back in, then your submission is that's obstruction of justice. No, sir, it is not. Well, I'm trying to find this line that you're drawing between passive non-cooperation on the one hand and what you're calling obstruction of justice. Well, I'm not saying she would have been convicted of it. But qualified immunity is a lesser thing. What I'm saying is everything that Gagnon knew going into it is more. So I think what your argument, believe me, I don't want to put words in your mouth, but I thought I was going to hear you say before now, and you still haven't said it, but I think you were getting there. Your argument is that a reasonable police officer would have had probable cause to believe this was obstruction of justice. Is that really your argument? Because that's all you have to win on, right? Well, yes, but even if he was wrong, he was wrong. I just gave you a wonderful case and you turn it down. No, no, yes. I don't understand. No, I guess I'm not. Maybe I'm not listening, but I do hear what you say. If a police officer has probable cause, then that's the end of the game, right? Right. But even if he doesn't. But you haven't even used that word in your argument. You have never said in the 10 minutes you've been up there, your honors, Gagnon had probable cause to believe. Forget what you just said. You wouldn't say that she was going to be convicted, but that's not the test. Well, I thought I argued that. That's why I was arguing all the facts, the continuum, the 15 minutes. I'm sorry. It's the legal effect of the facts that matter. Right. Not the facts because the facts, we draw the facts in favor of the plaintiff. That he reasonably believed he had probable cause. And he took the extra protection. Yes, I accept the gift. I did hear it. I may not be the world's best orator, but I do believe. It's not really about oration. It's about the legal test. Yes, that is the question. But there's also the argument that even if he was wrong, even if he was wrong and he didn't really have probable cause, he's still entitled to qualified immunity. It depends on how wrong he was, doesn't it? Well, I don't even think Judge Ellis reached the issue of whether he had probable cause. And that's part of the problem for me. Because that's the real question. Would a reasonable officer under the similar circumstances have believed she had probable cause? It seems to me that that's what the case comes down to. Well, yes, because that's the second. Drawing inferences in favor of the plaintiff with respect to the historical facts. Yes. Including the seven-minute piece. And the evidence that other people in the line and not, yes, did he reasonably believe. Was he acting as a reasonable police officer based on his frame of reference of what happened when he went? And the fact that he took the step of obtaining the warrant is something that should be considered in that analysis. And then the fact that his supervisor. Don't you understand that's question begging? Well. The fact that he sought a warrant is not proof that he had probable cause at the time for purposes of qualified immunity. And in fact, he didn't have probable cause the first time he went to the magistrate. No, he didn't. No, he didn't. Exactly. So just right. So Virginia has this rule, apparently, where you can actually get an arrest warrant without recording what you say. Where does that come from? How is that protective of people's Fourth Amendment protections when you can just go into some magistrate's bedroom or living room without a recording? Without a writing and just say, oh, this is what happened, Your Honor. And his honor just issues an arrest warrant. Well, and now no court will ever know what he actually said to the judge who issued the arrest. But that's Virginia's. And that's not my client's fault. That's a policy decision that my line has nothing to say. A cynic would say the law enforcement you would think I would think law enforcement would want the protection of a record of what was said to an issuing judge or magistrate. Well, that's a policy argument. And I have no I'm not. That wasn't brief. That wasn't. I understand. That's an argument. And it was raised by. But one of the cases we cited reality Torshinsky. It was an oral representation. And there was no evidence to rebut what he said. And what I hear what they're arguing is, even if everything my client said in deposition from his report and her report was before the magistrate, his argument is that was insufficient. Not that my officers lied. What more in the record is there other than a subjective belief? Graham was encouraging the flight. I mean, in all that, just a subjective belief and not an objective belief. Well, the office of the totality of the circumstances argument is and any inferences that can be derived because they were kept waiting so long. And because of what he knew, it happened in the ten minutes before he actually got there with the son, with the mother not answering the side door and with them banging on the door. And the time of night, it was what was he what was in his mind? Yes, it's not. But it's not subjective in terms of what the Supreme Court has laid out as the requirement. It is what is known to the officer at the time. He he to his knowledge, she is delaying them. Yes. Now, that's his belief. But that's his inferences. And the cases say you can rely on the officer's experience. I take your point about delaying. But in response to my colleague's hypothetical, you said that if she had just not opened the door, taken an hour, that wouldn't have been obstruction. That would have been a longer delay. Right. But the fact that she did open the door, the fact that she did. I'm not arguing she should have been convicted of obstruction of justice. Probable cause is less. It's and then qualified immunity, according to Messerschmidt, is even less than probable cause. You can be entitled you are entitled to qualified immunity under a lesser state. You don't have to have probable cause. That's my argument. The judge found they're entitled to qualified immunity. That's my argument. These officers should be given qualified immunity. They made a mistake. They're entitled to the immunity. They didn't lie. They didn't lie. So you're conceding it was a mistake? Well, that's what. And no, really. Did you just concede they made a mistake?  Well, you just said they made a mistake. Well, I thought I said if they made a mistake. You said they made a mistake. But that's qualified immunity. That's qualified immunity. Regardless of whether or not there was actually probable cause. And that's why Judge Ellis found they were entitled to qualified immunity. If you have to have probable cause, if it's nothing less than probable cause, then qualified immunity doesn't exist. In other words, a reasonable mistake. Right. About the existence of probable cause. Yes. Provides immunity. Yes. Yes, sir. Okay. So we're in agreement. Your argument is that this was a reasonable mistake. Yes. Not if, but you agree it was a reasonable mistake. At most it was a reasonable mistake. At most. And I think that's what the judge concluded. Because of the totality of the circumstances. Otherwise, if they always have to have probable cause. No, they just have to avoid an unreasonable mistaken belief. Yes. In the existence of probable cause. So then what's the evidence? Why didn't they arrest her on sight? Under Virginia law, like just about everywhere else that I'm aware of, a misdemeanor committed in the presence of an officer renders that person subject to immediate custodial arrest. Correct? Yes. My time is up. May I answer the question? Yes. On the record, it's clear there were only the three officers on duty and there would have been no one else. He would have had to transport Colby Twynham. One of the others would have had to transport the plaintiff and arrest. And there'd been, this is small jurisdiction with only three officers that night. Usually the shift is four. They had only three and they were all there at the same time. And there would have been insufficient coverage. Thank you. Thank you. Ms. Graham wasn't arrested that day, the next day or afterwards. She didn't do anything about it. She didn't do anything about it until she learned from Gagnon that he had not received his warrant. But let me go, if I may, to an issue that was clearly raised by Judge Floyd on the issue of what was told to the magistrate. If it's available to you, if you could take a look at the appendix at page 262 and 263, because it's very poignant, juxtaposed pages. First on page 262, line 17, I'm asking Officer Clipp what she told Gagnon when she learned that he hadn't gotten the warrant. I said something to the effect of, are you kidding me? Because she had shut the door on my foot as well as other things that she stated that she wasn't going to get Colby. She wasn't going to bring him to the front door. That's what Officer Clipp testified that she told Gagnon upon learning that he hadn't gotten the warrant, following which he went and gave his second magistrate all his probable cause. Then I asked her at her deposition, facing page 263, you recognize the difference between simply not getting Colby and telling you flat out I'm not going to get Colby? You recognize that difference? Yes. Are you testifying that Lauren Graham told you that she was not going to get Colby? No. What she said was, I've got to go speak to him. And what she did was, in fact, did she not end up leading him to the door? Yes. But she did not say that she was not going to get Colby. Correct. Nor did she say that she was not going to bring him to the front door. Correct. If that testimony is true, then what she told Gagnon was not. What does Gagnon say? His recollection, he spoke in very, I gave the judge everything. He understood that. I gave the judge everything I knew. Everything I had. I don't remember exactly. Yeah, that's exactly so, Judge. About the time, to the extent it matters, which it shouldn't on summary judgment because we get the inferences. What happened with Colby is irrelevant to the arrest of Lauren Graham. I don't represent Colby. Colby slugged some kid and got arrested. What's relevant to Lauren Graham's arrest is the amount of time that Lauren Graham was involved in this enterprise. On the issue of Messerschmitt and those cases, there's no doubt that officers are entitled to make reasonable mistakes. They can make reasonable mistakes of fact and they even can make reasonable mistakes of law. But they can't make unreasonable mistakes of law. And this court has so held and held in not so very long ago in Rogers versus Stem. And it's held that in Merchant versus Bowers, where a police officer so. So misconstrued the law that he was denied qualified immunity. I respectfully submit that that's what what is at issue here and that the court should reverse. Thank you. Thank you. We will come down and greet the lawyers and then go directly to our next.
judges: Diana Gribbon Motz, Henry F. Floyd, Andre M. Davis